IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

ESTATE OF CAPTAIN BRADLEY      §
JAMES THOMPSON, ET AL.         §
                               §
V.                             §        CIVIL NO. 4:07-CV-594-Y
                               §
SUN LIFE ASSURANCE             §
COMPANY OF CANADA              §

ORDER GRANTING DEFENDANT'S MOTIONS FOR SUMMARY
JUDGMENT AND TO STRIKE EVIDENCE AND GRANTING PLAINTIFFS' MOTION TO
STRIKE IN PART AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pending before the Court is defendant Sun Life Assurance Company's
motion for summary judgment [doc. #16], as well as its motion to strike
evidence produced by the plaintiffs in support of their motion for
summary judgment [doc. #25].  Plaintiffs' motion for summary judgment
[doc. #19] and motion to strike portions of the defendant's summary-
judgment evidence [doc. #53] are also before the Court.  Having
reviewed the motions, responses, and replies, the Court GRANTS Plain-
tiffs' motion to strike in part, DENIES Plaintiffs' motion for summary
judgment, and GRANTS Defendant's motion to strike and its motion for
summary judgment.


I.  Background

This is an employee-benefit case governed by the Employee Retire-
ment Income Security Act of 1974.  *See* 29 U.S.C. 1001, et. seq
("ERISA").  On October 20, 2006, Captain Bradley James Thompson was
found dead in his bedroom. [Def. Mtn. App. at 50-51.]  Thompson was
hanging, nude, from a black strap tied to the metal framing of his
ceiling.  [*Id.; see also* Def. Mtn. App. at 43-44.]

An autopsy was performed on Thompson's body by the Tarrant County
medical examiner.  Deputy Chief Medical Examiner Dr. Marc Krouse

concluded that the manner of death was accidental and that the cause of death was hanging. [Def. Mtn. App. at 42.] Dr. Krouse summarizes the facts supporting his finding that Thompson's death was by hanging as follows:

> A) Ligature marking of neck consistent with posterior suspension
>
> B) Soft tissue hemorrhages anatomically above ligature marking with crushing of soft tissue under ligature
>
> C) Conjunctival petechiae
>
> D) Visceral congestion with pulmonary and cerebral edema
>
> E) No evidence of laryngeal or hyoid fracture

[Def. Mtn. App. at 42.]

Dr. Krouse also discovered "[d]ried material consistent with semen . . . on [Thompson's] right thigh." [Def. Mtn. App. at 44.] Based apparently on Thompson's nudity and the presence of semen, the parties address this case as dealing with what is known as "autoerotic asphyxiation" [*See* Def. Mtn. App. at 25-26.] or "the practice of limiting the flow of oxygen to the brain during masturbation in an attempt to heighten sexual pleasure." *Todd v. AIG Life Ins. Co.*, 47 F.3d 1448, 1450 (5th Cir. 1995).

At the time of his death, Thompson was employed by Communication Technologies, Inc., and was a participant in the company's employee-benefit plan. Communication Technologies delegated its administrative authority over the plan to defendant Sun Life Assurance Company, the plan's provider. [Def. Mtn. App. at 115.] Plaintiff Rachel Ruiz is Thompson's named beneficiary. After Thompson's death, on November 27, Ruiz submitted a claim for benefits to Sun Life.

Sun Life paid Ruiz the basic life-insurance benefits due under

the plan. [Def. Mtn. App. at 30-35.] By letter dated December 20, however, Sun Life denied Ruiz's claim for accidental death and dismemberment (AD&D) benefits. The letter states:

> We have reviewed the Police Report and Autopsy Report received from Tarrant County, TX. According to the Police Report, officers arrived on the scene in response to a suicide attempt and found Mr. Thompson had hung himself. The results of the autopsy confirmed the cause of death as hanging.

[Def. Mtn. App. at 35.] The letter then recites certain policy provisions. Summarized, these provisions provide that if a covered employee suffers an "Accidental Bodily Injury" and provides notice of proof of his claim to Sun Life within 365 days of the injury, Sun Life will pay, subject to certain exclusions, one-hundred percent of the AD&D benefit in effect at the time of the injury. [*Id.* at 35-36 (letter); 86-88 (policy).]

Also noted in the letter is the policy's exclusion of "a loss which is due to or results from . . . suicide while sane or insane [or] intentionally self-inflicted injuries." [Def. Mtn. App. at 35-36, 86-88.] Finally, the letter informs Ruiz of Sun Life's decision to deny the claim based on its conclusion that Thompson's injuries "were reasonably foreseeable and were the natural and probable result of conduct knowingly undertaken;" that the injuries causing his death were self-inflicted; and that Thompson's death was excluded under the suicide and self-inflicted-injuries clause. [*Id.* at 36.]

Pursuant to the policy's provisions, Ruiz appealed the denial of her AD&D claim. [Def. Mtn. App. at 25-26.] Based in part on the autopsy report and the fact that it disclosed ligature marks, soft tissue damage and pulmonary and cerebral edema (the build up of fluid in the lungs and brain), Sun Life again denied Ruiz's claim. [Def. Mtn.

App. at 16-17.]  Ruiz was informed of the denial of her appeal by
letter dated March 19, 2007. [*Id.*]

As part of its review of the claim, Sun Life also consulted Dr.
Katherine Hollister, an independent medical consultant.  [*Id.* at 18-
24.]  Hollister reviewed the police report, Thompson's death certifi-
cate and amended death certificate, the autopsy report, and other
documents in reaching the conclusion that Thompson was engaged in the
"high risk activity" of autoerotic asphyxiation.  [*Id.*]

After her appeal was denied, Ruiz filed suit in a Texas state
court asserting that the denial violated ERISA, as well as advancing
state-law claims of negligent misrepresentation and violation of the
Texas Insurance Code.  Sun Life then removed the case to this Court.
Ruiz acknowledges in her summary-judgment briefing that her state-law
claims are preempted by ERISA, leaving only her ERISA claim before the
Court.  Summary judgment as to Ruiz's state-law claims is, therefore,
GRANTED in favor of Sun Life.  The Court has jurisdiction over Ruiz's
ERISA claim pursuant to 29 U.S.C. § 1132.  *See Estate of Bratton v.
Nat'l Union Fire Ins*., 215 F.3d 516, 520-21 (5th Cir. 2000).


II.  Evidentiary Objections

A. Ruiz's Motion to Strike

Both parties have filed a motion to strike the other's summary-
judgment evidence.  In her motion, Ruiz claims that Hollister's opinion
may not be considered because it was not properly disclosed.  She
further contends that all of Sun Life's summary-judgment evidence
should be struck because it was not properly disclosed to her under

4

the terms of the plan or ERISA.

Ruiz argues both the terms of the plan and various ERISA regulations imposed a duty upon Sun Life to disclose its use of Hollister and to provide her with a copy of the administrative record. Section 2560.503-1(h)(1) of Title 29 of the Code of Federal Regulations provides:

> In general. Every employee benefit plan shall establish and maintain a procedure by which a claimant shall have a reasonable opportunity to appeal an adverse benefit determination to an appropriate named fiduciary of the plan, and under which there will be a full and fair review of the claim and the adverse benefit determination.

29 C.F.R. § 2560.503-1(h)(1).

Ruiz also cites § 2560.503-1(j)(3), which requires that, in the case of an adverse benefit determination, a plan administrator must provide notification of the claimant's entitlement to receive copies of all documents and information relevant to the claim. *See* 29 C.F.R. § 2560.503-1(j)(3). Section 2560.503-1(m)(8) defines "relevant" information, in pertinent part, as information that:

> (I)   Was relied upon in making the benefit       determination;
>
> (ii)  Was submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination;
>
> (iii) Demonstrates compliance with the administrative processes and safeguards required pursuant to paragraph (b)(5) of this section in making the benefit determination

29 C.F.R. § 2560.503-1(8)(m).

Finally, Ruiz argues that the plan's terms required Sun Life to disclose Hollister's opinion as part of the denial of her claims. The "claim provisions" portion of the benefits booklet provided to Thompson

upon his enrollment in the plan states "If Sun Life denies all or any part of your claim on review, you will receive a written notice of denial setting forth . . . the identity of any medical or vocational experts whose advice was obtained in connection with the appeal, regardless of whether the advice was relied upon to deny the appeal." [Def. Mtn. App. at 160] Ruiz argues that this provision is not merely an agreement between the parties, but is enforceable under ERISA as it was intended to provide the full and fair disclosure contemplated by § 2560.503-1(h)(1).

In regard to the lack of disclosure of Hollister's opinion as part of the initial denial letter, Sun Life offers the simple explanation that because Hollister was not consulted until after the initial denial, her opinion could not have been disclosed as part of that denial. As to any claim that Ruiz was to be notified of Hollister's opinion before Sun Life rendered its final decision after review, as well as to Ruiz's broader claim that all of Sun Life's summary-judgment evidence should be struck, Sun Life argues that even if it did not technically comply with ERISA and its regulations, such non-compliance "will be excused so long as the purpose of [29 U.S.C. § 1133] has been fulfilled." *See Wade v. Hewlett-Packard Dev. Co. LP Short Term Disability Plan*, 493 F.3d 533, 539 (5th Cir. 2007).

"The purpose of section 1133 is to afford the beneficiary an explanation of the denial of benefits that is adequate to ensure meaningful review of that denial." *Id.* (quotations and citation omitted). Alleged violations of ERISA and its regulations are evaluated under the "substantial compliance standard." *See id*. This test "considers all communications between an administrator and plan

6

participant to determine whether the information provided was suffi-
cient under the circumstances." *Id.*

Sun Life notes that Thompson's benefits booklet contained an
extensive statement of the rights provided by ERISA.  Additionally,
in the initial denial letter of December 20, Sun Life notified Ruiz
it was denying her claim, revealed the documents upon which it was
relying (the police report and autopsy report), and identified the
policy provisions that it claimed supported the denial.  The letter
further informed Ruiz of her right to appeal and her ability "to
request free of charge copies of all documents, records, and other
information relevant to your claim for benefits." [Def. Mtn. App. at
36.]

Finally, Ruiz argues that Sun Life's notices of denial did not
comply with ERISA and its regulations in that it did not
inform her of alternative-dispute-resolution methods available to her.
Sun Life responds that the United States Department of Labor has
decided not to enforce compliance with the regulation requiring
disclosure of methods of alternative dispute resolution.  *See*
http://www.dol.gov/ebsa/faqs/faq_claims_proc_reg.html (FAQ D-13)(last
visited November 13, 2008).  Sun Life also argues that Ruiz was not
harmed by their failure to inform her of methods of  alternative
dispute resolution.  Ruiz has not requested that the Court stay this
case in favor of an effort at alternative dispute resolution or
otherwise made the Court aware of any attempts to pursue non-judicial
resolution of her claim.

In light of the foregoing, the Court concludes that the December
20 letter of denial complied with 29 C.F.R. §§ 2560.503-1(h), (j)(3)

in that it provided Ruiz with adequate notice of the denial of her claim, the reasons therefor, her right to appeal, and her right to obtain the evidence relied upon by Sun Life in making its decision. *See Weber*, 493 F.3d at 540 (noting the requirements of section 1133). Moreover, the communications between Sun Life and Ruiz--the benefits booklet, the December 20 letter, and the March 19, 2007, denial letter--substantially comply with section 1133 and its related regula-tions. Sun Life has not, however, justified its failure to comply with the terms of its plan in not disclosing Hollister's identity prior to deciding Ruiz's appeal. Sun Life cannot seek to avoid the terms of the benefits booklet on one hand yet use the booklet to support its substantial-compliance argument on the other. Ruiz's motion to strike is therefore, GRANTED in regard to Hollister's opinion and DENIED in all other respects.

B. Sun Life's Motion to Strike

Sun Life has filed its own motion seeking to strike the affidavit of plaintiff Ruiz filed in support of her motion for summary judgment. Specifically, Sun Life argues that because Ruiz's affidavit was not part of the administrative record, it may not be considered in this litigation. The United States Court of Appeals for the Fifth Circuit has stated:

> Once the administrative record has been determined, the district court may not stray from it but for certain limited exceptions, such as the admission of evidence related to how an administrator has interpreted terms of the plan in other instances, and evidence, including expert opinion, that assists the district court in understanding the medical terminology or practice related to a claim.

*Estate of Bratton*, 215 F.3d at 521. The claimant must be given a

reasonable opportunity to contest the completeness of the record and to add additional evidence to the record by submitting it to the administrator in a manner that gives the administrator a fair opportunity to consider it.  As noted above, the December 20 letter informed Ruiz of the information upon which Sun Life relied in denying her claim.  The letter also informed her of her right to request a copy of all information relevant to her claim, and of her right to appeal the denial by submitting "an appeal in the form of written comments, documents, records or other information relating to [her] claim." [Def. Mtn. App. at 36.]  Ruiz was, therefore, given an adequate opportunity to challenge and add to the administrative record.

Ruiz argues that her affidavit may be considered as evidence related to the interpretation of the terms of the plan.  She argues that Sun Life's explanation that "[t]he injuries resulting in Mr. Thompson's death were reasonably foreseeable and were the natural and probable result of conduct knowingly undertaken and therefore, were not due to accidental means" has been held legally incorrect and an abuse of discretion under the test announced in *Wickman v. Northwestern National Insurance Company*, 908 F.2d 1077 (1st Cir. 1990).  *See Carter v. Sun Life Assur. Co.*, No. 05-2214 R(1), 2006 U.S. Dist. LEXIS 28622 (E.D. La. May 11, 2006) (noting the Fifth Circuit's adoption of the *Wickman* test in *Todd v. AIG Life Ins.*, 47 F.3d 1448 (5th Cir. 1995) and *Schadler v. Anthem Life Ins. Co.*, 147 F.3d 388 (5th Cir. 1998)).

Even assuming that these cases cited by Ruiz support her argument that Sun Life erroneously interpreted the plan, it is not for Ruiz to give an opinion as to the correct interpretation.  Ruiz argues she may give her opinion as a lay opinion under Federal Rule of Evidence 701.

But whether the administrator's interpretation of the plan is correct is a question of law, *cf. Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110-15 (1989) (discussing ERISA review standards), and the Federal Rules of Evidence allowing for opinion testimony are not "intended to allow a witness to give *legal* conclusions." *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983) (emphasis in original); *see also* FED. R. EVID. 704 advisory committee's note (noting opinions under Rule 701 "must be helpful to the *trier of fact*" and Rules 701 and 403 assure that opinions that merely state what result to reach or are phrased in terms of legal criteria are excluded). Sun Life's motion to strike is, therefore, GRANTED.

III.  Discussion

    A.  Legal Standards

        1.  Summary Judgment

When the record establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law," summary judgment is appropriate. FED. R. CIV. P. 56(c). An issue is considered "genuine" if "it is real and substantial as opposed to merely formal, pretended, or a sham." *Bazan v. Hidalgo County.*, 246 F.3d 481, 489 (5th Cir. 2001). Facts are considered "material" if they "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To determine whether there are any genuine issues of material fact, the Court must first consult the applicable substantive law to ascertain what factual issues are material. *Lavespere v. Niagra Mach. & Tool Works*, 910 F.2d 167, 178 (5th Cir. 1990). Next, the Court must

review the evidence on those issues, viewing the facts in the light most favorable to the nonmoving party. *Id.*; *Newell v. Oxford Mgmt. Inc.*, 912 F.2d 793, 795 (5th Cir. 1990).

In making its determination on the motion, the Court must look at the full record including the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. *See* FED. R. CIV. P. 56(c); *Williams v. Adams*, 836 F.2d 958, 961 (5th Cir. 1988). Rule 56, however, "does not impose on the district court a duty to sift through the record in search of evidence to support" a party's motion for, or opposition to, summary judgment. *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992). Thus, parties should "identify specific evidence in the record, and . . . articulate" precisely how that evidence supports their claims. *Forsyth v. Barr*, 19 F.3d 1527, 1536 (5th Cir. 1994). Further, the court's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249.

To prevail on a summary-judgment motion, the moving party has the initial burden of demonstrating that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law. *Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986). When the moving party has carried its summary-judgment burden, the respondent must go beyond the pleadings and by his own evidence set forth specific facts showing there is a genuine issue for trial. *Arbaugh v. Y&H Corp.*, 380 F.3d 219, 222 (5th Cir. 2004) (citing *Celotex*, 477 U.S. at 324); *see also* FED. R. CIV. P. 56(e). This burden is not satisfied by creating some metaphysical doubt as to the material facts, by

11

conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249-50.


### 2. Standards of Review

In making a benefit determination, a plan administrator performs two tasks. *See Wade*, 493 F.3d at 537. The administrator must "determin[e] the facts underlying the benefit claim." *Id.* "The administrator's factual determinations are reviewed for abuse of discretion." *Id.* Thus, Sun Life's factual determinations will be reviewed with "due deference [to the extent they] reflect a reasonable and impartial judgment." *Pierre v. Conn. Gen. Life Ins. Co.*, 932 F.2d 1552, 1563 (5th Cir. 1991).

The administrator must then "determine whether those facts constitute a claim to be honored under the terms of the plan." *Schadler v. Anthem Life Ins. Co.*, 147 F.3d 388, 394 (5th Cir. 1998). This step generally involves a determination of eligibility, *see Wildbur v. Arco Chem. Co.*, 974 F.2d 631, 636 (5th Cir. 1992), and may include construction of the terms of the plan. *See Wade*, 493 F.3d at 537. If an administrator has discretionary authority in regard to these determinations, a court is to review the administrator's determinations for an abuse of discretion. *See Wade*, 493 F.3d at 537-38; *see also Wildbur*, 974 F.2d at 636.

The parties contest whether Sun Life, as the third-party claims

administrator, has discretionary authority. Sun Life argues that the

AD&D policy expressly provides for discretionary authority in stating:

> The Plan Administrator has delegated to Sun Life its entire
> discretionary authority to make all final determinations
> regarding claims for benefits under the benefit plan insured
> by this Policy. This discretionary authority includes, but
> is not limited to, the determination of eligibility of
> benefits, based upon enrollment information provided by the
> Policyholder, and the amount of any benefits due, and to
> construe the terms of this policy.
>
> Any decision made by Sun Life in the exercise of this au-
> thority, including review of denials of benefit, is conclu-
> sive and binding on all parties. Any court reviewing Sun
> Life's determinations shall uphold such determination unless
> the claimant proves Sun Life's determinations are arbitrary
> and capricious.

[Def. Mtn. App. at 115.]

Ruiz responds that while the policy may attempt to delegate

discretionary authority, the underlying plan did not create such

authority on behalf of the original administrator (Thompson's employer,

Communication Technologies). Ruiz argues that one cannot delegate what

does not exist in the first instance. Additionally, Ruiz argues that

in the event of inconsistencies between the plan and the policy, the

plan controls and that ambiguities must be resolved in favor of the

plan participant. Finally, she argues that the discretionary-authority

provision is unenforceable because the plan participants were not

notified of it.

But as argued by Sun Life, the underlying plan does include

language sufficient to create discretionary authority in favor of the

plan administrator. The plan states that "[p]roof [of the claim] must

be satisfactory to Sun Life" and "[b]enefits are payable when Sun Life

receives satisfactory Proof of Claim." [Def. Mtn. App. at 157.]. Sun

Life argues that similar language was held to grant discretionary

authority in *Magee v. Life Insurance Company of North America*, 261 F. Supp. 2d 738, 749 (S.D. Tex. 2003). While the claimant in *Magee* had not argued that the plan did not grant the administrator discretion, the Court is satisfied that this language from the plan, coupled with the above language from the policy, is sufficient to create discretionary authority in Sun Life to determine eligibility for benefits and to construe the terms of the plan. *See Wildbur v. Arco Chem. Co.*, 974 F.2d 631, 636-37 (5th Cir. 1992) (rejecting the argument that particular language is required to confer discretionary authority and stating that instead a court must read the plan as whole); *see also Yeager v. Reliance Std. Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir. 1996) (a determination that evidence is satisfactory requires an exercise of discretion). And, as noted above, the participants were notified upon enrollment of the terms of the plan by way of a booklet.

The Court, therefore, applies an abuse-of-discretion standard in reviewing Sun Life's eligibility determination and construction of the plan's terms. This standard of review is tempered however, where, as here, a professional insurance company as "plan administrator both evaluates claims for benefits and pays benefits claims." A conflict of interest thus exists that must factored into a court's review. *Metro. Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2348, 2349-51 (2008).


### 3. Procedure Under *Wickman v. Northwestern National Insurance Company* and Burdens of Proof

"[A]s a matter of general insurance law, the insured has the burden of proving that a benefit is covered, while the insurer has the burden of proving that an exclusion applies." *Critchlow v. First UNUM*

14

*Life Ins. Co. of Am.*, 378 F.3d 246, 256 (2d Cir. 2004). These princi-
ples apply in an ERISA case. *See id.*

In reviewing an administrator's determination of whether a death
is accidental or whether a death fits within a self-inflicted-injury
exclusion, a court must evaluate the deceased insured's subjective
intent and expectations in engaging in the activity that led to his
death. *See Wickman v. Northwestern Nat'l Ins. Co.*, 908 F.2d 1077, 1088
(1st Cir. 1990); *see also Todd*, 47 F.3d at 1456; *Schadler*, 147 F.3d
at 397 n.10. A court must then evaluate the objective reasonableness
of the insured's intent and expectations in light of the insured's
background and characteristics. *See Schadler*, 147 F.3d at 397 n.10;
*see also Todd*, 47 F.3d at 1456; *Wickman*, 908 F.2d at 1088.


B. Analysis
     1. The Underlying Facts

Neither Sun Life nor Ruiz provide substantial factual statements
in their briefing before the Court. Nevertheless, the facts upon which
Sun Life relied in denying Ruiz's claim are clear from the December
20, 2006, and March 19, 2007, letters and the documents they refer to.
Thompson was found dead and in the nude in his bedroom, having hanged
himself from a black strap secured to his ceiling. A substance
consistent with semen was found dried on Thompson's leg and, by all
accounts, Thompson died while participating in autoerotic asphyxiation.
Ruiz does not contest this basic set of facts. Rather, her argument
focuses on Sun Life's eligibility determination.


     2. Eligibility Determination

In its letters to Ruiz, Sun Life states that the basis for its denial of her claim is that Thompson's death falls within his policy's suicide and self-inflicted-injury exclusions. Sun Life does not attempt to justify its denial based on the suicide exclusion. Ruiz argues that Sun Life should not be allowed to rely on the self-inflicted-injury exclusion because Sun Life did not plead the exclusion as an affirmative defense. Ruiz notes that "as a matter of general insurance law, the insured has the burden of proving that a benefit is covered, while the insurer has the burden of proving that an exclusion applies." *Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 765 (2d Cir. 2002). Ruiz then cites the case of *Fought v. UNUM Life Insurance Company of America*, 357 F.3d 1173, 1185 (10th Cir. 2004) (per curiam) for the proposition that this general rule applies to exclusions in ERISA cases. As noted by Sun Life, however, *Fought* has been vacated.[1]

Nevertheless, the Court agrees with the proposition for which *Fought* is cited. But regardless of whether plan exclusions are to be treated as affirmative defenses, Sun Life has not waived its ability to rely on the self-inflicted-injury exclusion. In the one case specifically dealing with exclusions as affirmative defenses from the Fifth Circuit, the court noted that the district court had assumed that exclusions are to be treated as affirmative defenses. *See Murray v. Crossmark Sales, Inc.*, 163 Fed. Appx. 339, 341 (5th Cir. January 23, 2006). The court then turned to the issue of whether the failure to plead an exclusion effected a waiver. Noting the general rule that

---

[1] Ruiz's counsel is warned against citing cases without disclosing negative history to the Court.

Federal Rule 8(c)'s waiver provision is not absolute because "where matter is raised in the trial court in a manner that does not result in unfair surprise, . . . technical failure to comply precisely with Rule 8(c) is not fatal," the court concluded there was no waiver. *Id.* (citations omitted). The exclusion was unambiguous and the claimant was on notice of the exclusion prior to the lawsuit. *See id.* Morever, the defendants had relied upon the exclusion in a motion filed several months before the trial setting and had asserted in their answer that the claims were denied "in accordance with the terms and conditions of the Plan." *Id.* at 341-42.

Similarly, the self-inflicted-injury exclusion in this case is clear and Ruiz has been aware of the exclusion in Thompson's plan since at least December 20, 2006--the date of the denial letter. In its answer, Sun Life asserted, as an affirmative defense, that "Defendant's decision to deny Plaintiff's claim for accidental death benefits was . . . in accordance with the terms of the employee benefit plan." [Def. Answer, doc. #8, at 3, ¶ 4.] And, as these summary-judgment proceedings demonstrate, Sun Life specifically raised the exclusion well before trial and Ruiz has claimed no prejudice in responding to the use of the exclusion as a defense. Thus, Sun Life has not waived its use of the self-inflicted-injury exclusion.

Ruiz also argues that, even if the self-inflicted-injury exclusion is available, Sun Life's determination that Thompson's death was due to self-inflicted injury is in error. Ruiz relies heavily on the case of *Todd v. AIG Life Insurance Company*, 47 F.3d 1448 (5th Cir. 1995) for the proposition that autoerotic asphyxiation is not a self-inflicted injury. Yet the opinion in *Todd* very clearly states that the

plan before the court included "no general exclusion for self-inflicted injury." *Todd*, 47 F.3d at 1452. The question in *Todd*, therefore, was not whether the plan participant died of self-inflicted injuries, but whether his death was an accident within the meaning of the policy. *See id.* at 1453.

State-court cases that Ruiz relies upon are similarly inapposite. Ruiz argues that the Texas case of *Connecticut General Life Insurance Company v. Tommie*, 619 S.W.2d 199 (Tex. Civ. App–Texarkana 1981, writ ref'd n.r.e.) stands for the proposition that the strangulation involved in autoerotic asphyxiation is not a self-inflicted injury. *Tommie*, however, involved appellate review of a no-evidence challenge of a jury finding that partial strangulation was not an injury under Texas law. *See Conn. Gen. Life Ins. Co. v. Tommie*, 619 S.W.2d 199, 202 (Tex. Civ. App–Texarkana 1981, writ ref'd n.r.e.). Constrained by its standard of review, the appellate court merely concluded that there was "some probative evidence" to support the jury's finding. *See id.* at 203.

Ruiz next turns to out-of-circuit precedent to support her argument. In *Padefield v. AIG Life Insurance Company*, 290 F.3d 1121, 1128-30 (9th Cir. 2002), the United States Court of Appeals for the Ninth Circuit held that a death related to autoerotic asphyxiation is not excluded from coverage by a self-inflicted-injury exclusion within an ERISA covered plan. After noting that its review was de novo, the Ninth Circuit concluded that the insured's subjective intent was not to injure himself but instead to "experience[] a temporary deprivation of oxygen, a euphoric light-headedness from the exposure to the industrial solvent, and an intensified sexual experience." *Padefield*

*v. AIG Life Ins. Co.*, 290 F.3d 1121, 1129 (9th Cir. 2002). According to the Ninth Circuit, "[n]one of these consequences is an 'injury' as that term is defined in the ordinary and popular sense by persons of average intelligence and experience." *Id.* (internal quotations and citation omitted).

The Ninth Circuit further concluded that the insured's intent was objectively reasonable, stating that "[a] reasonable person with background and characteristics similar to Mr. Padfield's would not have viewed the strangulation injury that resulted in his death as 'substantially certain' to result from his conduct." Ultimately, the court concluded that the insured had "engaged in actions that led to a fatal injury," but were reasonably expected not to result in "injury as that word is commonly defined." *Id.* at 1130.

As for the proposition that *death* must be substantially certain in order for the insured's intent to be objectively unreasonable, the Ninth Circuit cites the Fifth Circuit's decision in *Todd*. Yet, as noted above, *Todd* did not deal with a self-inflicted-injury exclusion. Thus, while *Todd* states that deaths during autoerotic asphyxia activity are not intended, it does so in evaluating whether the death was accidental--i.e., covered by the policy in the first instance--and in light of the defendant's argument that a per-se rule excluding such deaths from coverage should be adopted. *See Todd*, 47 F.3d at 1452-53.

*Todd* is also distinguishable in that the policy in *Todd* did not include a definition of "accident." *See Todd*, 47 F.3d at 1456. Conversely, the policy before this Court does. Sun Life's policy states "accidental bodily injury" is "bodily harm caused *solely* by

19

external, violent and *accidental means* which is sustained directly and *independently* of all other causes." [Def. Mtn. App. at 67.] While the injuries that ultimately took Thompson's life—-the prolonged oxygen deprivation and attendant failure of essential bodily functions--were accidental, his initial injuries--the partial strangulation and temporary deprivation of blood and oxygen were not. Thus, his death was not solely caused by independent accidental means as required by the policy in order to be covered in the first instance.

Furthermore, unlike *Todd*, the policy in this case does include a self-inflicted-injury exclusion. Thus, even assuming that Thompson's death is covered, the Court must evaluate Thompson's subjective intent and whether a belief on the part of Thompson that he would survive *or be uninjured* is objectively reasonable. *See Critchlow v. First UNUM Life Ins. Co. of Am.*, 378 F.3d 246, 259 (2d Cir. 2004) (noting the first question is whether the deceased "subjectively lacked an expecta-tion of death or injury"); *see also Padefield*, 290 F.3d 1129 (stating that if the physical consequences intended by the deceased were "injuries," the self-inflicted-injury exclusion applies).

Thompson's policy states "No accidental death or accidental dismemberment payment will be made for a loss which is due to or results from . . . intentionally self-inflicted injuries." [Def. Mtn. App. at 88.] When faced with a similar situation the Fifth Circuit concluded that the insured's death fell within the exclusion. *See Sims v. Monumental Gen. Ins. Co.*, 960 F.2d 478, 480-81 (5th Cir. 1992). In *Sims*, the policy excluded loss, including death, "resulting directly or indirectly, wholly or partly from . . . [an] intentionally self-inflicted injury." *Id.* at 480 (alterations in original). The

*Sims* court concluded that the intended effects of autoerotic asphyxia amount to an injury and thus the unintended injury of death was not covered under the plan. *See id.* While the exclusion now before the Court is not as broad as that in *Sims*, the Court nevertheless concludes that it was reasonable for Sun Life to determine that Thompson's death was due to or resulted from a self-inflicted injury.

And, despite Ruiz's arguments to the contrary, Thompson's self-inflicted hanging and the resulting cessation of blood and oxygen flow to his brain were injuries. The Court respectfully disagrees with courts that have concluded that the act of autoerotic asphyxiation does not involve what its commonly understood as an injury. "Partial strangulation is an injury in and of itself." *Id.* As noted in *Sims*, "the type of strangulation desired by [a person engaged in autoerotic asphyxia] damages tissues in the neck and deprives the brain of valuable oxygen." *Id.; see also Padefield*, 290 F.3d at 1131 (Leavy, J., dissenting) (noting that regardless of the presence of visible marking, the deceased's intentional acts were an injury to his brain that prevented it from properly functioning); *Cronin v. Zurich Am. Ins. Co.*, 189 F. Supp. 2d 29, 38 (S.D.N.Y. 2002) (noting that "[i]f the practitioner retains his senses . . . the pressure on the carotid arteries can be relieved in time to prevent *permanent* damage to the tissues of the neck or brain, and the body can *recuperate*.") (emphasis added); *Bryant v. AIG Life Ins. Co.*, No. 4:01-CV-92, 2002 U.S. Dist. LEXIS 23289, at *16 (W.D. Mich. November 27, 2002) (disagreeing with the assumption that "injury" requires visible or lasting effect and noting that the "overwhelming majority of federal courts [have con-cluded] that the partial strangulation involved in autoerotic asphyxia-

tion comes within the plain meaning of 'intentionally self-inflicted injury.'").

Ruiz contends that the Court may not rely on *Sims* because it was not an ERISA case but was instead an insurance case decided under Louisiana state law. It is true that "[i]nsurance policies governed by ERISA are to be interpreted in light of federal common law" but "[i]n ascertaining the applicable federal common law, [a court] may draw guidance from analogous state law." *Todd v. AIG Life Ins. Co.*, 47 F.3d 1448, 1451 (5th Cir. 1995). Moreover, Louisiana law governed the question of intent, not whether the act was an injury. *See Sims*, 960 F.2d at 480 (discussing *Bazley v. Tortorich*, 397 So. 2d 475, 481 (La.1981)). And while the Fifth Circuit does cite the decisions of various state and federal courts in deciding whether autoerotic asphyxiation involves injury, in *Todd* the Fifth Circuit explained that it had "neither agreed nor disagreed with [three of the] cases." *Todd*, 47 F.3d at 1454. Two additional state-court cases are cited for the common-sense proposition that strangulation is an injury, *see Sims*, 960 F.2d at 480—a proposition that the opinion in *Todd* does not dispute. *See Todd*, 47 F.3d at 1453 n.4, 1454 (discussing *Sims*). The Court is not, therefore, barred from considering *Sims*, merely because it did not involve ERISA.

Nor is the Court barred from considering *Sims* because it is inconsistent with federal common law. While *Sims* may be in conflict with cases such as *Padefield*, it is certainly not in conflict with all ERISA cases on this issue. In discussing the divergence of case law

on this issue, the court in *Padefield* notes that four federal courts[2] have held that autoerotic asphyxia deaths are excluded under a self-inflicted-injury provision under a plan governed by ERISA. *See Padefield*, 290 F.3d at 1128 (citing *Cronin v. Zurich Am. Ins. Co.*, 189 F. Supp. 2d 29 (S.D.N.Y. 2002) *Hamilton v. AIG Life Ins. Co.*, 182 F. Supp. 2d 39, 49-50 (D. D.C. 2002); *Fawcett v. Metropolitan Life Ins. Co.*, No. C-3-97-540, 2000 U.S. Dist. LEXIS 10061 (S.D. Ohio June 28, 2000)). Sun Life has brought more to the Court's attention. *See Bond v. Ecolab, Inc.*, No. 06-15072, 2007 WL 551595 (E.D. Mich. Feb. 21, 2007); *Fugate v. Reliastar Life Ins. Co.*, No. 504CV245OC10GRJ, 2005 WL 1225006 (M.D. Fla. May 23, 2005). The Court has discovered additional cases supporting a conclusion that an autoerotic asphyxia related death is excluded by a self-inflicted-injury provision. *See Bryant*, 2002 U.S. Dist. LEXIS 23289, at *16 (concluding autoerotic asphyxiation involves self-inflicted injury); *Lonergan v. Reliance Std. Life Ins. Co.*, No. CA 96-11832-PBS, 1997 U.S. Dist. LEXIS 24075, at *14-18 (D. Mass. May 29, 1997) (concluding that deceased's death was not accidental as required by the terms of the policy); *Parker v. Danaher Corp.*, 851 F. Supp. 1287, 1295 (W.D. Ark. 1994) (stating, in concluding that an autoerotic asphyxia related death was a covered accident that "we are not faced in this case with an exclusionary clause for injury resulting directly or indirectly from an intentionally self-inflicted injury.").

The Court is thus free to consult the reasoning in *Sims* and these

---

[2] One of the cases cited in *Padefield*, *Critchlow v. First UNUM Life Ins. Co. of Am.*, 198 F. Supp. 2d 318 (W.D.N.Y. 2002) has since been reversed by *Critchlow v. First UNUM Life Ins. Co. of Am.*, 378 F.3d 246 (2d Cir. 2004). This may abrogate *Cronin* as well.

other federal cases in determining the ordinary and accepted meaning of the terms used in the policy. "[T]he language of insurance contracts should be given their ordinary and generally accepted meaning if there is one." *See Todd*, 47 F.3d at 1452 n.1. As *Sims* and its federal allies demonstrate, contrary to the Ninth Circuit's understanding, "injury" as commonly understood indicates not merely pain or discomfort, but physical damage. *See* Merriam-Webster's Collegiate Dictionary (11th ed. 2004) (defining "injury" as "an act that *damages or* hurts") (emphasis added).

In reaching the conclusion that self-strangulation is not an injury, Ruiz and the cases she cites speak in generalities. For instance, *Padefield* states that autoerotic asphyxiation "*usually* does not leave visible marks on the neck." 290 F.3d at 1126. But as noted by the dissent in *Padefield*, regardless of visible marking, it is the "intentional act of injuring [the] brain [that] render[s] it incapable of functioning . . . [and] result[s] in death." *Padefield*, 290 F.3d at 1131 (Leavy, J., dissenting). And, in this particular case, a man of over 250 pounds hanged himself by the neck. While Ruiz would have the Court conclude that all of the strangulation markings and tissue damage found by the medical examiner were a result of the unintended duration of Thompson's hanging, Thompson's size and the methods he employed make it reasonable to conclude that part of his injuries occurred as a result of his intended activity. *See Lonergran*, 1997 U.S. Dist. LEXIS 24075, at *17-18 (concluding deceased who had hanged himself from the ceiling without some safety mechanism was unreasonable in believing he would escape injury). Thus, generalities aside, Thompson's belief that he would not be injured is unreasonable.

And, if the Court is to consider generalities, they support the conclusion that Thompson's actions are excluded under the self-inflicted-injury exclusion. The Ninth Circuit in *Padefield* notes that autoerotic asphyxiation "is a repetitive pattern of behavior that individuals engage in over a period of years." *Id.* at 1130. It is reasonable to conclude that the repeated act of depriving one's brain of blood and oxygen is an injury as understood "in an ordinary and popular sense [by] a person of average intelligence and experience." *Keszenheimer v. Reliance Std. Life Ins. Co.*, 402 F.3d 504, 507 (5th Cir. 2005).

The most persuasive support for Ruiz's position is the case of *Critchlow v. First UNUM Life Insurance Company of America.* In *Critchlow*, the United States Court of Appeals for the Second Circuit concludes that autoerotic asphyxiation is not an injury as that term is commonly understood. *See Critchlow*, 378 F.3d at 259-63. The Second Circuit also concludes that, even assuming it is an injury, such injury does not cause the insured's death and is not, therefore, excluded under a self-inflicted-injury clause. *See id*. at 260. Similar reasoning is found in the Fifth Circuit's opinion in *Todd* where the court states:

> Perhaps bodily injuries 'intentionally' inflicted by the insured are not caused by accident, even without a policy exclusion of intentional injuries; but in our view the injuries that caused death in this case, and very likely in other similar cases, were not intentionally inflicted. The claimed basis for announcing a per se rule of federal law--that death by autoeroticism of the kind involved in this case cannot be accidental--is thus untenable.

*Todd*, 47 F.3d at 1453.

This language from *Todd* is dicta, and is countered by the language

of the policy at issue in the current case, which provides that loss

due to or resulting from self-inflicted injury is excluded from

coverage. And, as discussed above, in *Sims* the Fifth Circuit held an

autoerotic asphyxia related death fell within a similarly worded

exclusion. As for *Critchlow*, the self-inflicted-injury exclusion

merely stated that "We will not pay if the loss is caused by . . .

[i]ntentionally self-inflicted injuries." *Critchlow*, 378 F.3d at 249.

Thus, under the terms of the policy at issue in *Critchlow*, the inten-

tionally self-inflicted injuries must have *caused* the insured's death,

rather than merely *resulted* in death. As the court in *Sims* explained

on this point:

> An analogy is helpful. If Mr. Brumfield had been a member
> of a fraternal organization that required him to brand his
> forearm, and he did so, any loss arising from the branding
> would be excluded. For instance, although he only intended
> to burn the insignia of the organization onto his skin, he
> might unintentionally burn into his muscle and do serious
> damage to his arm. He intended some injury, but another,
> unintended injury *resulted*. The loss would not be covered
> by the policy at issue here.

*Sims*, 960 F.2d at 480 (emphasis added). As further explained by Judge

Leavy, dissenting in *Padefield*:

> [I]n the present case, Mr. Padfield intended to restrict the
> flow of oxygen to his brain by self-asphyxiation with a
> necktie. This intentional act inflicted an injury from which
> Mr. Padfield never recovered. Whether such an intentional
> act leaves ligature marks on the deceased's body is of
> little or no significance. Mr. Padfield's intentional act
> of injuring his brain rendered it incapable of functioning.
> His intentional act caused injury to a live organ. This
> injury to his brain rendered it incapable of saving him from
> death. This is an intentionally self-inflicted injury which
> resulted in death. Such a loss is not covered under the
> terms of the policy.

*Padefield*, 290 F.3d at 1131 (Leavy, J., dissenting). Similarly,

Thompson, a man of over 250 pounds, intentionally hanged himself by

the neck, without providing for any safety mechanism or release, in

order to cut off the flow of oxygen and blood to his brain. It was, therefore, reasonable for Sun Life to consider the result of Thompson's autoerotic-asphyxiation activities an injury under the policy.

With this conclusion in mind, the *Wickman* framework supports affirming Sun Life's decision to deny Ruiz's claim. The Court must first look to the insured's subjective intent. *See Wickman v. Northwestern Nat'l Ins. Co.*, 908 F.2d 1077, 1088 (1st Cir. 1990); *see also Todd*, 47 F.3d at 1456; *Schadler*, 147 F.3d at 397 n.10. Thompson's subjective intent was to partially strangle himself, something that the Court has concluded is an injury and, therefore, subject to the policy's exclusion. While Sun Life has presented proof in support of its application of the self-inflicted-injury exclusion, Ruiz has not presented the sort of evidence courts have relied upon in concluding that the expectation of surviving autoerotic asphyxiation is objectively reasonable. *cf. Lonergan*, 1997 U.S. Dist. LEXIS 24075, at *17-18 (concluding that the deceased's death was not accidental because his belief that he would go uninjured was not objectively reasonable as he had not employed any "safety mechanism"). In *Critchlow*, for example, the court noted that the deceased had engaged in the activity for several years and had "set up an elaborate escape mechanism designed to save him if he began to lose consciousness." *Critchlow*, 378 F.3d at 260; *see also Padefield*, 290 F.3d at 1130 (concluding that the insured was objectively reasonable in expecting to survive given that he had engaged in the activity in the past); *Todd*, 47 F.3d at 1450 (noting the deceased had developed a system of leashes as a safety device). Ruiz has not, in support of her own motion or in response to Sun Life's, presented such evidence. In light of the foregoing

analysis, the Court is confident that Sun Life's apparent conflict of interest did not play such a role in its decision as to outweigh the other factors considered. The Court concludes, therefore, that regardless of whether Thompson expected to die, his actions are subject to the self-inflicted-injury exclusion because he subjectively intended to injure himself, any belief that he would avoid injury was objectively unreasonable, and his death resulted from his self-inflicted injuries.

Finally, Ruiz provides various examples of accidental deaths that also would not be covered should the Court hold that Thompson's death by autoerotic asphyxiation is not covered. But all of the examples provided by Ruiz are distinguishable. She points to the example of a deep-sea diver who drowns due to equipment malfunction or the hunter who shoots himself while cleaning his gun. However, the diver does not intend to partially drown himself nor the hunter to partially shoot himself. A person engaged in autoerotic asphyxiation indisputably intends to partially strangle himself. Ruiz also gives the example of a practitioner of martial arts. This example is inapposite to this case because martial artists train themselves to employ their techniques safely, in a controlled environment, under the supervision of a teacher with advanced skills. Thus, their intent to suffer injury and survive could be seen as objectively reasonable.

IV. Conclusion

Accordingly, the Court concludes that Sun Life did not abuse its discretionary authority in concluding that Thompson's death was excluded by the self-inflicted-injury clause. Its motion for summary

judgment is, therefore, GRANTED.  As discussed above, its motion to strike Ruiz's affidavit is GRANTED as well.  Ruiz's motion to strike is GRANTED in part and DENIED in part, and her motion for summary judgment is DENIED.

SIGNED December 10, 2008.

_____
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE